# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

**United States of America**,

       Plaintiff;

       v.

REAL PROPERTY LOCATED AT
6513 RIDGE ROAD, PARKVILLE,
MISSOURI, 64152, ALONG WITH
ALL ITS BUILDINGS,
APPURTENANCES, AND
IMPROVEMENTS;

REAL PROPERTY LOCATED AT
209 2ND COURT, PALM BEACH
GARDENS, FLORIDA, 33410,
ALONG WITH ALL ITS
BUILDINGS,
APPURTENANCES, AND
IMPROVEMENTS;

REAL PROPERTY LOCATED AT
6525 EAST CAVE CREEK ROAD,
NUMBER 15, CAVE CREEK,
ARIZONA 85331, ALONG WITH
ALL ITS BUILDINGS,
APPURTENANCES, AND
IMPROVEMENTS;

NATIONAL FINANCIAL
SERVICES IRA ACCOUNT
NUMBER XXXXXX2585,
SERVICED BY MML INVESTOR
SERVICES;

Case No. 18-6028-CV-SJ-ODS

NATIONAL FINANCIAL
SERVICES IRA ACCOUNT
NUMBER XXXXXX2665,
SERVICED BY MML INVESTOR
SERVICES;

$11,218 AND ACCRUED
INTEREST IN WELLS FARGO
ADVISORS ACCOUNT NUMBER
XXXXX1125;

$69,079 AND ACCRUED
INTEREST IN WELLS FARGO
ADVISORS ACCOUNT NUMBER
XXXXX4187;

PERSHING LLC ACCOUNT
NUMBER XXXXXX8721;

PERSHING LLC ACCOUNT
NUMBER XXXXXX2203;

ALL FUNDS IN PLATTE
VALLEY BANK ACCT. NO.
XXXX2022 IN THE NAME OF
ZIESON CONSTRUCTION
COMPANY, LLC; and

ALL FUNDS IN PLATTE
VALLEY BANK ACCT. NO.
XXXX2207 IN THE NAME OF
ZIESON CONSTRUCTION CO
LLC.

     Defendants.

# COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by its attorneys, Timothy A. Garrison, United States Attorney for the Western District of Missouri, and Stacey Perkins Rock, Assistant United States Attorney, brings this complaint and alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1.     This is an action to forfeit property to the United States for violations of 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C)[1].

## THE DEFENDANTS *IN REM*

2.     The defendant real properties consist of the following properties:

6513 Ridge Road, Parkville, Missouri, 64152, together with all its buildings, appurtenances, and improvements and is more fully described as: All of Lot 88, THE NATIONAL – FIRST PLAT, Lots 1-89, Tracts A-X, a subdivision of land in Parkville, Platte County, Missouri.  Subject to all easements, restrictions and reservations, if any, now of record;

209 2nd Court, Palm Beach Gardens, Florida, 33410, together with all its buildings, appurtenances, and improvements and is more fully described as: Unit 209, Sandalwood Estates, P.U.D., according to the Plat thereof, recorded in Plat Book 32, Page(s) 167, of the Public Records of Palm Beach County, Florida.  Parcel ID Number 52-43-42-07-18-000-2090; and

---

[1] 18 U.S.C. § 981(a)(1)(C) provides for forfeiture of property derived from proceeds traceable to, *inter alia*, a "specified unlawful activity" (SUA) or a conspiracy to commit such an offense.  SUAs are defined at 18 U.S.C. § 1956(c)(7).  SUAs include any offense under Section 1961(1).  18 U.S.C. § 1956(c)(7)(A).  Section 1343 wire fraud and Section 1956 money laundering are identified at 18 U.S.C. § 1961(1)(B).

6525 E. Cave Creek Road, Unit 15, Cave Creek, Arizona, 85331, together with all its buildings, appurtenances, and improvements and is more fully described as: Unit 15, of HIDDEN ROCK AT CAVE CREEK, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 1212 of Maps, Page 19, and 2nd Amended HIDDEN ROCK AT CAVE CREEK, recorded in Book 1224 of Maps, page 19, and Corrective 2nd Amended subdivision Plat of HIDDEN ROCK AT CAVE CREEK, recorded in Book 1226 of Maps at page 41, of Official Records of Maricopa County, Arizona.

Together with an easement for private ingress or egress access rights, storm water management facilities, utility maintenance access and emergency vehicles over Tract 15, as created in said plat.

The recorded owner of 6513 Ridge Road, Parkville, Missouri and 209 2nd Court, Palm Beach, Florida is Patrick Michael Dingle. The recorded owner of 6525 E. Cave Creek Road, Unit 15, Cave Creek, Arizona is Monica Haavig.

3.       The defendant real properties have not been seized but are located within the jurisdiction of the Court as described below. The United States does not request authority from the Court to seize the defendant real properties at this time. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1), post notice of this action and a copy of the Complaint on the defendant real properties, and serve notice of this action on the defendant real properties' owners, and any other person or entity who may claim an interest in the defendants, along with a copy of this Complaint. The United States also moves for certain injunctive relief as to the defendant real properties. The United States may elect to file *Lis Pendens* as to the defendant real properties at any time.

4.       The United States moves for injunctive relief to freeze the following investment accounts. The accounts include:

4

a. MML Investors Services, LLC Account Number XXXX X2585 in the name of Michael P. Dingle;

b. MML Investor Services, LLC Account Number XXXXX 2665 in the name of P Michael Dingle Revocable Trust, P Michael Dingle, Trustee;

c. Wells Fargo Advisors Account Number XXXX1125, in the amount of $11,218.00 and accrued interest, in the name of Monica L. Haavig;

d. Wells Fargo Advisors Account Number XXXX4187, in the amount of $69,079 and accrued interest, in the name of Monica L. Haavig;

e. Pershing LLC Account Number XXXXX8721 in the name of Matthew L. Torgeson Trust, UAD 03/15/10, Matthew L Torgeson TTEE, XXXX XXXX, TOPEKA KS 66606-1937;

f. Pershing LLC Account Number XXXXXX2203in the name of Matthew L. Torgeson Trust, XXXX XXXX, TOPEKA KS 66606-1937;

g. All Funds in Platte Valley Bank Acct. No. XXXX2022 in the name of Zieson Construction Company, LLC;

h. All Funds in Platte Valley Bank Acct. No. XXXX2207 in the name of Zieson Construction Company, LLC.

5. The defendant investment and financial accounts have not been seized but are located within the jurisdiction of the Court as described below. The United States does not request authority from the Court to seize the defendant investment and financial accounts at this time.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a). This Court has *in rem* jurisdiction

over the defendant properties pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in the Western District of Missouri.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in the Western District of Missouri, and pursuant to 28 U.S.C. § 1395(a), (b), and (c).

## GROUNDS FOR FORFEITURE

8.    The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in transactions or in attempted transactions in violation of sections 1956, 1957 and 1960 of Title 18, United States Code, or are properties traceable to such property.

9.    The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), because they constitute or were derived from proceeds traceable to an offense constituting a SUA as defined in Section 1956(c)(7) and 1961(1) of Title 18, United States Code, or a conspiracy to commit such offense.  Such offenses include violations of 18 U.S.C. § 1343 (wire fraud) and 1956 (money laundering).

## FACTS

10.    There is probable cause to believe Matthew Torgeson (Torgeson), Michael Patrick Dingle also known as Patrick Michael Dingle (Dingle), Matthew McPherson (McPherson) and their co-conspirators utilize the Service Disabled Veteran (SDV) and 8(a) minority status of Stephon Ziegler (Ziegler), Rustin Simon (Simon) and Jacob Baucom (Baucom) to compete for and obtain federal government (Government) set-aside contracts to which Torgeson, Dingle and McPherson are not entitled, because they are neither

Case 5:18-cv-06028-ODS   Document 17   Filed 03/16/18   Page 6 of 52

SDVs nor 8(a) minorities. This scheme denies legitimate SDVOSBs and 8(a) minority owned and operated small business concerns from obtaining the work and profits from set-aside contracts to which they are entitled.

11.  Through the creation of Zieson Construction Company, LLC (Zieson), Simcon Corp (Simcon), and Onsite Construction Group, LLC (Onsite), Torgeson, Dingle, McPherson and their co-conspirators were able to fraudulently claim SDVOSB and 8(a) status for those entities in order to obtain approximately $352 million in Government set-aside contracts primarily for the personal benefit of Torgeson, Dingle and McPherson, none of whom are SDVs or SBA certified minorities.

12.  In order to qualify for set-aside contracts, the SDV or 8(a) minority business owner must manage and control the day-to-day operations and long-term decision-making for the business. Additionally, the SDV or 8(a) minority must be the highest paid employee of the set-aside business or provide an explanation as to why it is in the best interest of the set-aside business that the SDV or minority owner is not the most highly compensated employee. Further, the set-aside business cannot be controlled by a non-SDV or non-minority "shadow owner."

13.  Zieson and Simcon are not qualified to obtain Government set-aside contracts because their SDV and minority owners do not manage and control day-to-day operations or long-term decision-making. Instead, Dingle manages and controls day-to-day operations of Zieson and Simcon. Further, it appears that Torgeson, Dingle and McPherson have received more money in the form of personal distributions than the SDV and minority owners. Onsite is a relatively new entity in the scheme and it appears the conspirators intend to use Onsite and Baucom's status in the same manner as they have been using Zieson, Ziegler, Simcon and Simon.

7

## SDVOSB PROGRAM

14.    The Veterans Entrepreneurship and Small Business Development Act of 1999 established an annual Government-wide goal of awarding contracts amounting to at least three percent of the total value of all federal prime and subcontract awards for participation by small business concerns owned and controlled by SDVs. The Veterans Benefits Act of 2003 established a procurement program for SDVOSBs. This procurement program provides that federal contracting officers may restrict competition to SDVOSBs and award a sole-source or set-aside contract where certain criteria are met.

15.    SDVOSB contracts are awarded solely to qualified disadvantaged veterans of the U.S. military. Federal law restricts these types of contracts in that only legitimate SDVOSBs are allowed to bid on and receive them. To designate these set-aside contracts, agencies use language in the solicitation such as "This acquisition is 100% set-aside for SDVOSB."

16.    Businesses vying for the SDVOSB status must be at least 51% owned by an individual who is a SDV. This SDV must, among other requirements:

    a.    be the highest compensated employee of the SDVOSB unless there is logical explanation submitted by the veteran as to why taking a lower salary than other employees benefits the business;

    b.    manage and control the daily operations and long-term decision making of the business;

    c.    be small as defined by SBA regulations; and

    d.    in a general construction contract, the SDVOSB must perform at least 15% of the cost for personnel with its own

employees.

Once a business obtains this certification, it may compete for Government issued contracts exclusively set aside for SDVOSBs.

17.     If a business fails to meet any one of these criteria it cannot be verified by U.S. Department of Veterans Affairs (VA) as SDVOSB and cannot bid on any Government agency contract set aside under the SDVOSB program.

18.     All owners of the applicant business must submit individual VA Form 0877 as part of the application.  This form includes an admonition that the making of a false, fictitious, or fraudulent certification may render the maker subject to prosecution under 18 U.S.C. § 1001.

19.     During the initial phase of the SDVOSB procurement program, owners of applicant businesses were required to self-certify through Government databases that they met the eligibility criteria to participate in the SDVOSB program.  Beginning in 2011, VA's Center for Verification and Evaluation (CVE) began a new verification process which requires applicants to submit materials online.  CVE relies on the truthfulness and accuracy of documents and statements made by business owners to determine eligibility for the program.

20.     Beginning in 2011, VA contracts awarded under the SDVOSB set-aside program required businesses to be CVE-verified and listed in the VA's Vendor Information Page (VIP) website.  Government agencies awarding contracts to SDVOSBs rely primarily on self-certifications in Government databases.  Initially, CVE verifications were valid for one year and the business had to re-apply to have their SDVOSB status renewed.  Effective June 27, 2012, CVE verification is valid for two years before renewal.

Case 5:18-cv-06028-ODS   Document 17   Filed 03/16/18   Page 9 of 52

21.     VA regulations limit a non-veteran's role in the management of an SDVOSB. These limits include barring a non-veteran's actual control or the power to control the SDV participating in the program, and prohibiting a non-veteran's compensation in excess of the business's highest officer which must be the SDV.

## 8(a) BUSINESS DEVELOPMENT PROGRAM

22.     Named for Section 8(a) of the Small Business Act, the U.S. Small Business Administration's (SBA) "8(a) program" is a development program created to help small, disadvantaged businesses (referred to as the "firm") owned and controlled by socially and economically disadvantaged individuals gain a foothold in Government contracting.

23.     8(a) firms can receive set-aside and sole-source contracts and are also able to form joint ventures to bid on and perform larger prime contracts. All joint ventures must be reported to the contracting agency and the joint venture must still meet the requirements for small business size and control as described below.

24.     Participation in the program is divided into two phases over nine years.  Once a firm graduates from or voluntarily withdraws from the program, it is prohibited from future participation.

25.     To qualify for the 8(a) program, a firm must be at least 51% owned and controlled by a U.S. citizen of good character who meets SBA's definition of socially and economically disadvantaged.  The firm also must be a small business as defined by SBA and show reasonable potential for success.  The firm's size is determined by their reported North American Industry Classification System (NAICS) codes and reported business income, including affiliated businesses.  SBA Office of Government Contracting determines the NAICS codes threshold for each industry that a business

10

must be below in order to be considered small.

26.     SBA determines the size of a firm as the three-year average of total receipts. SBA laws and regulations require a firm to report income from all affiliated businesses.  A firm that receives 8(a) status is also eligible for non-8(a) small-business contracts (SB contracts) so long as the firm meets SBA's criteria for being small and does not violate SBA's rules regarding, among other things, affiliation, control and subcontracting with other firms.

27.     Generally, affiliation exists when one business controls or has the power to control another or when a third party controls or has the power to control both businesses.  Control may arise through ownership, management, or other relationships or interactions between the parties.  Individuals or firms that have identical (or substantially identical) business or economic interests may be treated as one party unless they can demonstrate otherwise.  Family members, persons with common investments, or firms that are economically dependent through contractual or other relationships, are considered affiliated.  Former managing members or key employees of one business who establish a new business in the same or related industry and serve as the new business' officers, managing members or key employees where the original business furnishes the new business with contracts, financial or technical assistance, indemnification on bid or performance bonds, and other facilities is considered affiliated.  Patterns of subcontracting, commingling of staff and facilities, and other veiled attempts to disguise the true nature of the relationship may evidence an impermissible affiliation of interest.

28.     To become certified under the 8(a) program, an applicant must submit SBA Form 1010.  For continued eligibility in the SBA 8(a) program, a company is required to submit SBA Form 1450 (Annual Update) and Form

413 (Personal Financial Statement) annually. Forms 1010 and 413 include warnings that providing any false information or making any misrepresentation subjects the submitting party to prosecution under 15 U.S.C. § 645 and 18 U.S.C. § 1001. SBA relies on 8(a) applicants to supply truthful information on all forms submitted as part of the application and continued-eligibility processes. 8(a) firms must disclose:

> a. all officers, directors, management members, and key employees so SBA can determine whether a former 8(a) or any non-8(a) eligible firm's principals are impermissibly controlling an individual claiming disadvantage; and
>
> b. other entities with which the firm shares resources and employees so SBA can determine whether an 8(a) firm is impermissibly affiliated with a non-8(a) firm.

29. Once a firm receives an 8(a) or SB contract, it must abide by certain subcontracting limitations based on the type of contract. For example, in a contract for services, an 8(a) or SB firm must perform at least 50% of the cost for personnel with its own employees.

30. SBA requires the above disclosures, among other reasons, so it can determine whether a former 8(a) firm's principal or another individual has sought to retain 8(a) status through the use of a lower-level employee as a figurehead disadvantaged owner of a new 8(a) firm or alternatively, by using a "shell" 8(a) or SB firm as a pass-through while in reality subcontracting all of the work to an 8(a)/SB-ineligible individual or firm.

## GOVERNMENT DATABASES

31. Any business seeking a contract or purchase agreement with the Government must first register online in Government-operated databases. These databases are under the authority of General Services Administration

(GSA). Before July 2012, prospective contractors were required to register in the Central Contractor Registration (CCR) and complete the Online Representations and Certifications Application (ORCA) prior to being awarded a contract. In July 2012, CCR and ORCA were combined into the System for Award Management (SAM).

32. The business must self-certify that it meets specific requirements related to status-based assertions annually or any time there is a substantive change in the accuracy of previous certifications. Each status-based business classification is fully defined with references and hyperlinks to the laws that govern the programs. All entries in these databases are made with the admonition of possible penalties under 18 U.S.C. § 1001. Contracting officials for the VA, Department of Defense (DoD), GSA, U.S. Department of Agriculture (USDA) and other Government agencies rely upon these certifications prior to awarding set-aside contracts.

## PASS-THROUGH OR "FRONT" COMPANIES ALSO KNOWN AS RENT-A-VET, RENT-A-MINORITY, OR SMALL BUSINESS FRAUD SCHEMES

33. Pass-through or front companies, also known as Rent-A-Vet, Rent-A-Minority, or Small Business (SB) fraud schemes are considered illegal and operate in the following manner:

    a. The SDVOSB, 8(a), or SB business is established by and/or controlled by one or more individuals who are not SDV, 8(a), or SB qualified;

    b. The non-SDV, non-8(a), or non-SB has another company, not certified as SDVOSB, 8(a), or SB, that the non-SDV, non-8(a), or non-SB intends to pass the work through to;

c. The non-SDV, non-8(a), or non-SB use the legitimate SDV, 8(a), or SB to qualify for and obtain set-aside and sole-source Government contracts and pass work and contract profits through to their non-SDVOSB, non-8(a), or non-SB firm, which is not entitled to receive the contract;

d. In cases where the scheme has been so successful the pass-through or front company develops into an actual company with hired employees who perform the required work, the non-SDV, non-8(a), or non-SB continues to control the SDVOSB, 8(a), or SB company and obtains more profits from the set-aside Government contracts than the SDV, 8(a), or SB owners.

34. The investigation revealed Zieson was formed as a pass-through and front company so Torgeson Electric Company, Inc. (Torgeson Electric) could obtain work in the form of sub-contracts from Zieson that it could not obtain directly as its own contract work. Torgeson and his conspirators also used Zieson proceeds to disburse greater profits to Torgeson, Dingle, and McPherson, or their entities, all non-SDV and non-8(a) qualified, than to Ziegler, the SDV and 8(a), owner. After Zieson became too large to qualify as a small business, the conspirators formed Simcon to fraudulently obtain 8(a) contracts and proceeds and Onsite to fraudulently obtain SDVOSB contracts and proceeds. Both Simcon and Onsite were created as pass-through and front companies for Zieson, to the benefit of Torgeson, Dingle and McPherson. Both Simcon and Onsite are part of this small business fraud scheme.

## TORGESON ELECTRIC

35. Torgeson Electric was formed in 1979 in Kansas.

36. Torgeson is the President of Torgeson Electric.

37. Torgeson is not an SDV or certified minority, therefore Torgeson Electric is not eligible for SDVOSB or SBA 8(a) set-aside contracts.

38. Ziegler worked for Torgeson Electric in the first two quarters of 2010 according to Kansas Department of Labor (DOL) records and became a majority owner of Zieson with Torgeson as minority owner as described in this Complaint.

39. According to Torgeson Electric's website, they perform residential, commercial, and industrial construction services similar to services provided by Zieson.

40. Approximately $23.6 million was deposited from Zieson and Simcon accounts into Torgeson Electric's Community America bank account between September 2010 to March 2017. These payments appear to be subcontract work from Zieson and Simcon.

41. Additionally, Torgeson received approximately $3.7 million in what appear to be personal distributions from the scheme as described in this Complaint.

### McPHERSON CONTRACTORS

42. McPherson Contractors, Inc. (McPherson Contractors) was formed in Kansas in 1972. It was registered as a foreign corporation in Missouri in or about September 1983.

43. Matthew McPherson (McPherson) is President of McPherson Contractors according to the most recent annual registration for 2016 filed in Missouri.

44. McPherson is not an SDV or certified minority, therefore McPherson Contractors is not eligible for SDVOSB or SBA 8(a) set-asides.

45. Monica Haavig (Haavig) worked for McPherson Contractors in 2009 and 2010 according to Kansas DOL records. Haavig also works for

Zieson and Simcon as described in this Complaint.

46.     McPherson Contractors has received approximately $6.8 million from Zieson and Simcon. Approximately $3.1 million appears to be subcontract work from Zieson.

47.     Additionally, McPherson received approximately $3.7 million in what appear to be personal distributions from the scheme as described in this Complaint.

## ZIESON

48.     Torgeson, Dingle and McPherson were involved with the creation of Zieson to use the SDV and minority status of Ziegler to compete for and obtain Government set-aside contracts. Zieson is not entitled to the set-aside contracts because Ziegler does not control the day-to-day operations or long-term decision-making, thereby precluding legitimate SDV and 8(a) minority owned and operated business concerns from being awarded set-aside contracts. If the Government would have known Ziegler did not actually control Zieson, the Government would not have awarded Zieson set-aside contracts.

49.     Zieson was formed on July 9, 2009, with Ziegler as 52% owner and Torgeson as 48% owner according to Kansas Secretary of State, Missouri Secretary of State, and CVE records.

50.     Torgeson formed First Avenue Leasing, LLC on January 26, 1998, in Kansas. Zieson signed a leasing agreement with First Avenue Leasing, LLC for rental space at 101 S.W. Tyler Street, Topeka, Kansas, on July 10, 2009 according to records provided to CVE.

51.     On or about September 22, 2009, Zieson was awarded it first 8(a) contract from the U.S. Department of Army (Army) for construction work at Fort Leonard Wood, Missouri. The first three payments of approximately

16

$1.1 million were disbursed by Army into Torgeson Electric's Community Bank Account x1201 further indicating Zieson was created as a front company for Torgeson Electric.

52.     Shortly after an SBA appeal from a competing SDVOSB accusing Zieson of having an impermissible affiliation with Torgeson Electric and McPherson Contractors in September 2009, Torgeson sold his shares to Ziegler on January 1, 2010.  Zieson's Operating Agreement, dated July 28, 2010, listed Ziegler as the sole member with 100% membership interest.

53.     Kansas DOL records indicated Ziegler worked at Torgeson Electric in the first and second quarters of 2010.  Ziegler has an electrical journeyman's license and had never operated a general construction business before according to records submitted to CVE.

54.     To hide their involvement, Torgeson, Dingle, and McPherson are not identified as paid employees of Zieson on state wage records.  However, Dingle is listed on requisite cover sheets attached to contract bids for Zieson as Vice-President and Dingle signed several SDVOSB contracts listing his title as Operation Manager.

55.     Ziegler and Simon do not run or oversee the day-to-day operations of Zieson and Simcon, respectively.  Ziegler and Simon only occasionally stop in the office briefly to sign paperwork.  Dingle manages and controls Zieson and Simcon on a day-to-day basis.

56.     Zieson's SAM database records demonstrated that on July 21, 2009, and multiple times a year until January 30, 2017, Ziegler completed approximately 30 SAM certifications for Zieson regarding two different DUNS numbers 051071416 and 831297093. All 30 SAM certifications attested that Ziegler managed and controlled Zieson and that Zieson met all SDVOSB regulations.

57.     Initial investigation revealed approximately 62 Government-funded contracts totaling approximately $317.4 million have been awarded, likely due to fraud, to Zieson from 2009 to the present from agencies including Army, VA, GSA and USDA. The majority, if not all, of these contracts were set-aside as SDVOSB or 8(a) with 29 confirmed as SDVOSB and 30 confirmed as 8(a).  Based on financial analysis of Zieson's bank accounts, it appears that the overwhelming amount of income Zieson receives is in connection with set-aside contracts involved in the scheme.

58.     TDM Holdings, LLC (TDM), which owns the building at 1601 Iron Street in North Kansas City where Zieson, Simcon and Onsite operate, was formed on July 3, 2014, in Kansas with McPherson as the registered agent and organizer. The latest annual report for TDM filed on January 5, 2017 lists the following members as having 5% or more of capital in TDM:

        a.      Matthew L. Torgeson Trust – C/O Matthew L. Torgeson, TTE;

        b.      Michael P. Dingle; and

        c.      CRM.

59.     CRM Investments, LC (CRM) was formed in Kansas on October 24, 2003. The latest annual report for CRM filed on January 9, 2017, lists the following members as having 5% or more of capital in CRM: Matthew C. McPherson and Mark R. McPherson.

### TORGESON, DINGLE AND McPHERSON

60.     Through the front companies of Zieson and Simcon, Torgeson and McPherson's companies benefited from subcontract work of set-aside Government contracts they could not have obtained directly as Government contracts.

61.     Additionally, Torgeson, McPherson and Dingle all received

18

proceeds, that is, money remaining in Zieson and Simcon accounts even after contract work was completed. That illicit proceed money was transferred to Torgeson, McPherson and Dingle, through their entities, in amounts far in excess of what Ziegler or Simon received as compensation. In order to disguise their involvement with Zieson and Simcon, Torgeson, McPherson and Dingle did not receive wages, but instead used their entities to acquire proceeds from these businesses to which they were not entitled.

62. Of the $317.4 million paid to Zieson and Simcon for set-aside Government contracts, Torgeson Electric received approximately $26.5 million from approximately September 2010 to August 2017 in what appears to be subcontract work from Zieson and Simcon. Approximately $24.7 million was from Zieson and $1.8 million was from Simcon. McPherson Contractors received approximately $3.1 million from March 2013 to April 2017 in what appears to be subcontract work from Zieson.

63. MLT Investments, LLC (MLT) was formed on October 31, 2011, in Kansas with Torgeson as the registered agent and organizer. MLT is believed to stand for Matthew L. Torgeson. MLT has a bank account at US Bank into which approximately $4.2 million was deposited from Zieson and Simcon accounts between April 2012 and July 2017. All of the money deposited into the MLT account is traceable to Government funds induced by fraudulent misrepresentations and awarded to Zieson and Simcon for set-aside contracts.

64. Mets, LLC (Mets) was formed on February 12, 2010, in Missouri with Dingle as the registered agent and organizer. Mets has a bank account at Platte Valley Bank into which approximately $6 million was deposited from Zieson and Simcon accounts between July 2010 and July 2017. The

overwhelming amount[2] of money deposited into the Mets account is traceable to Government funds fraudulently induced and awarded to Zieson and Simcon for set-aside contracts. Mets' address is identified as Dingle's residence, 6513 Ridge Road, Parkville, Missouri, on its tax forms and bank account statements. Mets has no known business purpose other than to serve as a repository for set-aside funds to be funneled to Dingle.

65. MLT, Mets and McPherson Contractors belonging to Torgeson, Dingle and McPherson respectively, received the majority of proceeds from the set-aside Government contracts obtained by Zieson as evidenced by Zieson's bank account records. Torgeson, Dingle and McPherson, individually and through their respective entities, received approximately $3.7 million each from 2015 through 2017 in what appears to be distributions, as reflected in the paragraphs 98 and 99 below, while Ziegler, who must be the highest compensated employee under SDVOSB requirements, only received approximately $1 million in compensation payments between approximately 2010 and 2017.

66. Not only are there no records of Mets and MLT performing subcontract work for Zieson or Simcon, but there are also no records discovered to date to show Mets or MLT have conducted any sort of business with Zieson and Simcon. Mets and MLT are being used to funnel proceeds of this scheme to Dingle and Torgeson. A visual depiction of Torgeson's, Dingle's and McPherson's ownership and financial interests in the above-described entities is attached hereto as **Exhibit 1**.

---

[2] Approximately $6 million in deposits is traceable to fraud; merely $11,000 in deposits is not.

## HAAVIG AND DINGLE

67.     Haavig received wages from McPherson Contractors from third quarter 2009 to second quarter 2010 according to Kansas DOL records.

68.     Haavig has been involved with Zieson from its inception. Haavig, who had been romantically involved with Dingle, was the office manager for Zieson and continues to work for Zieson from Arizona where she now resides.

69.     Haavig worked for Zieson from approximately 2010 through at least the 4th quarter of 2017 according to Missouri employment records and Haavig's bank statements.

70.     Haavig is believed manage Zieson's financial records in order to keep this scheme going.  In addition to payroll, Haavig and her entity, Haavig and Associates, L.L.C. (Haavig and Associates) has also received payments from Zieson and Mets, Dingle's entity, all of which is traced to federal set-aside contract disbursements.

71.     Haavig and Associates was formed in Missouri on December 21, 2007, with Haavig as the registered agent and organizer.

72.     In a letter to SBA dated May 4, 2010, Haavig signed on behalf of Haavig and Associates, and stated her company has performed contracting work with Zieson, giving Zieson a favorable recommendation.   There is no record of Haavig and Associates ever performing contract work with Zieson.

73.     Haavig or Haavig and Associates began receiving funds from Mets in September of 2010. From September of 2010 through May of 2017, in addition to Zieson payroll, Haavig or her entity received approximately $620,020 from Mets to include the following large, lump sum checks from Mets' Platte Valley Bank account:

21

a.  Two checks totaling $100,000, both remitted on December 24, 2015;

b.  $250,000 check remitted on February 19, 2016; and

c.  $100,000 check remitted on May 18, 2017.

74.  Bank account records show Haavig closed on her Arizona property in or about August 2016. Haavig was then living in Arizona and working for Zieson from her residence. The payments to Haavig from Mets correspond with Haavig's move to Arizona and appear to be distributions for Haavig's participation in the scheme.

75.  At the time those checks were remitted from the Mets account to Haavig, Zieson and Simcon deposits accounted for the overwhelming majority of deposits funding the Mets account at Platte Valley Bank. Further, all of the deposits from Zieson and Simcon into the Mets accounts is traceable to set-aside contract funds awarded by the Government.

## SIMCON AND ZIESON OVERLAP

76.  Zieson increased in size due to the many SDVOSB and 8(a) contracts they had obtained. Thus, Zieson exceeded the size to be considered a small business under SBA regulations for set-aside Government contracts for small businesses. Therefore, it is believed that Dingle and his co-conspirators created a new 8(a) company using the minority status of Simon, a Zieson employee, called Simcon.

77.  Zieson's primary NAICS code is 236220- Commercial and Institutional Building Construction. SBA size standard for this code is $36.5 million. Zieson's three-year (2012-2014) aggregate gross receipt average was $36.1 million.

78.  Simcon was formed on February 21, 2014 in Missouri with Simon as the incorporator and registered agent. Simon filed a foreign for-

profit corporation application with Kansas on November 24, 2014.

79.     Simon, a Zieson employee until at least October 2014, is a certified 8(a) minority.

80.     CVE was unable to determine Zieson's three-year average for 2013-2015 because Zieson failed to provide their 2015 corporate tax documents.  On August 31, 2016, CVE sent Zieson a Notice of Proposed Cancellation letter explaining that Zieson appeared to have exceeded the size of the NAICS code.

81.     Initial investigation revealed approximately three Government-funded contracts totaling approximately $12.5 million have been awarded, likely due to fraud, to Simcon during fiscal years 2016 and 2017 from Army and United States Air Force.  The majority, if not all, of these contracts were set-aside as 8(a).  Based on financial analysis of Simcon's bank accounts, it appears that Simcon only receives income in connection with set-aside contracts involved in the scheme.

82.     Simcon's business address listed on their Facebook page is 1601 Iron Street, Suite 203, North Kansas City, Missouri, which is in the same building and floor as Zieson and Onsite and owned by TDM, Torgeson, Dingle and McPherson's entity.

83.     On or about January 25, 2016, Simon transmitted a certification to SAM representing that Simcon was classified as "small."  The audit trail for this electronic submission showed that the IP address associated to this submission was XX.XX.XXX.228.  That IP address is linked to Zieson.

84.     On or about June 8, 2016, Simon applied with SBA to participate in the 8(a) program.  As part of the application process, Simon claimed he was the 100% owner of Simcon and claimed his socially disadvantaged group as "Native American."  Simon provided his resume as

part of the application which showed he was employed with Zieson as Superintendent from 2011 to 2014.

85.    Simon provided the following information on his 8(a) application:

    a.    Simcon does not have an affiliation with any other business concern;

    b.    Simcon does not buy from, sell to, or use the services or facilities of any other business concern, or otherwise conduct business with any other business concern, in which a principal of the applicant business concern has a financial or any other interest;

    c.    No outside entities or individuals provide financial or bonding support, licenses or required professional certification, office space or equipment to Simcon;

    d.    No one other than the economically and socially disadvantaged individual (Simon) holds the highest position in Simcon;

    e.    No employee, owner, director, officer, partner, or management member who is not economically and socially disadvantaged receives compensation in any form from Simcon that exceeds the compensation of the highest ranking disadvantaged individual of the business concern (Simon); and

    f.    Simon is not currently employed outside Simcon.

86.    On or about July 27, 2016, Simon received notification from SBA that he was accepted into the 8(a) program and that his nine-year program term began the same date.

87.    On December 2, 2016, Simon admitted in a sworn declaration that he was employed by Zieson from July 2011 until he allegedly ceased work with Zieson in October 2014.  He also claimed to have no employment

relationship with Zieson since that time. However, Simon signed Simcon's 2016 annual filing with Kansas as President and listed 816-505-1695 as his contact phone number. That phone number is linked to Zieson.

88.     On or about February 9, 2017, SBA Office of Inspector General (OIG) received information from a SBA business opportunity specialist indicating Simcon was awarded a contract worth approximately $8 million at Fort Leavenworth, Kansas; however, the SBA business opportunity specialist believed Simcon was related to a larger company, Zieson, based on metadata embedded in an email to SBA allegedly from a Simcon email account. Simcon should have been precluded from receiving the contract due to the affiliation with Zieson and Zieson's large size.

89.     Metadata underlying emails sent from Simon and Dingle revealed that Simcon used a Zieson server. Specifically, Simon sent SBA emails from account "Rusty.Simon@simconcorp.com" on September 8, 2016 and October 5, 2016. The metadata of these emails revealed that the emails were associated with a Zieson server.

90.     Dingle sent an email to SBA on October 4, 2016 from account mike.dingle@simconcorp.com. Metadata revealed the email was associated to a Zieson server. Dingle also sent an email to SBA regarding Simcon on or about October 5, 2016 from his Zieson email address, mike.dingle@zieson.com.

91.     From in or about March 2015 through in or about August 2016, while Haavig was receiving regular Zieson payroll deposits into her Platte Valley Bank account, Haavig also maintained and used a Simcon credit card account at CoreFirst Bank & Trust (CoreFirst).

92.     In or about January 2015, Simcon submitted an application for a credit card account with CoreFirst. Simon signed the application as Simcon's

25

President and Haavig signed as Simcon's Secretary.

93.    That same month, Zieson submitted an application for a credit card account with CoreFirst. Ziegler signed the application as Zieson's Officer and Haavig signed as Zieson's Secretary, just as she had for Simcon.

94.    On January 19, 2017, an email was sent to CoreFirst from Haavig's Zieson email account with her Zieson signature block stating in part, "**Simcon Corp** would like to order a credit card for" four named individuals. It should be noted that on December 2, 2016, just before this request, Simon declared in a sworn statement as part of the SBA appeal that "Zeison [sic] and Simcon are competitors. Zieson has no ownership, financial or management interest in Simcon."

95.    Kansas DOL records reveal that one of those individuals for whom a Simcon credit card was requested, Zieson Employee A, has been employed by Zieson since 2012. Another one of those individuals, Zieson Employee B, has been employed by Zieson since the second quarter of 2015.

96.    On March 27, 2017, and again on July 11, 2017, emails were sent to CoreFirst from Haavig's Zieson email account with her Zieson signature block stating that Simcon wanted to order credit cards.

97.    As part of participating in the 8(a) program, Simcon provided annual updates, Forms 1450 and 413, certifying compliance with program regulations. On June 6, 2016, and August 21, 2017, Simcon claimed that Simon owned and controlled 51% or more of the company and had no affiliation with any other business concern. These annual updates contained Simon's signature and listed Simcon's address as XXXXXXXXX, Smithville, Missouri 64089.

26

## ZIESON AND SIMCON PAYMENTS TO
## TORGESON, DINGLE AND McPHERSON ENTITIES

98.     From approximately February 2015 through approximately June 2017, McPherson Contractors (owned by McPherson), Mets (owned by Dingle) and Torgeson personally or his entity MLT received disbursements in the amount of $3,696,909 each from Zieson and Simcon accounts for a total of $11,090,727 in disbursements as identified herein:

| Date | Payable To | Amount | Check Number | Account Drawn On |
|---|---|---|---|---|
| 2/5/15 | McPherson Contractors, Inc. | $450,000 | 19790 | Zieson CoreFirst Acct x1454 |
| 2/5/15 | METS, LLC | $450,000 | 19791 | Zieson CoreFirst Acct x1454 |
| 2/5/15 | Torgeson Electric Co. Inc. | $400,000 | 19792 | Zieson CoreFirst Acct x1454 |
| | | | | |
| 2/5/15 | McPherson Contractors, Inc. | $35,000 | 10035 | Simcon CoreFirst Acct x3271 |
| 2/5/15 | METS, LLC | $35,000 | 10036 | Simcon CoreFirst Acct x3271 |
| 2/5/15 | Torgeson Electric Co. Inc. | $35,000 | 10037 | Simcon CoreFirst Acct x3271 |
| | | | | |
| 2/23/15 | Torgeson Electric Co., Inc. | $350,000 | 19960 | Zieson CoreFirst Acct x1454 |
| 2/27/15 | McPherson Contractors, Inc. | $300,000 | 19993 | Zieson CoreFirst Acct x1454 |
| 2/27/15 | METS, LLC | $300,000 | 19994 | Zieson CoreFirst Acct x1454 |
| | | | | |
| 2/17/16 | McPherson Contractors, Inc. | $655,700 | 11203 | Zieson Platte Valley Bank Acct x2022 |
| 2/17/16 | METS, LLC | $655,700 | 11204 | Zieson Platte Valley Bank Acct x2022 |
| 2/17/16 | MLT Investments, LLC | $655,700 | 11205 | Zieson Platte Valley Bank Acct x2022 |
| | | | | |

| 3/17/16 | McPherson Contractors, Inc. | $30,000 | 10167 | Simcon CoreFirst Acct x3271 |
|---|---|---|---|---|
| 3/17/16 | METS, LLC | $30,000 | 10168 | Simcon CoreFirst Acct x3271 |
| 3/17/16 | MLT Investments, LLC | $30,000 | 10169 | Simcon CoreFirst Acct x3271 |
| | | | | |
| 4/20/16 | McPherson Contractors, Inc. | $255,700 | 11451 | Zieson Platte Valley Bank Acct x2022 |
| 4/20/16 | METS, LLC | $255,700 | 22236 | Zieson CoreFirst Acct x1454 |
| 4/20/16 | MLT Investments, LLC | $255,700 | 22237 | Zieson CoreFirst Acct x1454 |
| | | | | |
| 5/16/16 | McPherson Contractors, Inc. | $400,000 | 11559 | Zieson Platte Valley Bank Acct x2022 |
| 5/16/16 | METS, LLC | $400,000 | 22298 | Zieson CoreFirst Acct x1454 |
| 5/16/16 | MLT Investments, LLC | $400,000 | 22297 | Zieson CoreFirst Acct x1454 |
| | | | | |
| 2/22/17 | McPherson Contractors, Inc. | $564,643 | 13307 | Zieson Platte Valley Bank Acct x2022 |
| 2/22/17 | Mets, LLC, Michael P Dingle D/B/A METS, LLC | $577,643 | 13308 | Zieson Platte Valley Bank Acct x2022 |
| 2/22/17 | MLT Investments, LLC | $589,643 | 13309 | Zieson Platte Valley Bank Acct x2022 |
| | | | | |
| 3/14/17 | McPherson Contractors, Inc. | $800,000 | 13412 | Zieson Platte Valley Bank Acct x2022 |
| 3/14/17 | METS, LLC, Michael P Dingle D/B/A METS, LLC | $787,000 | 13413 | Zieson Platte Valley Bank Acct x2022 |
| 3/14/17 | MLT Investments, LLC | $775,000 | 13415 | Zieson Platte Valley Bank Acct x2022 |
| | | | | |
| 4/18/17 | McPherson Contractors, Inc | $175,000 | 23824 | Zieson CoreFirst Acct x1454 |
| 4/18/17 | METS, LLC | $175,000 | 23825 | Zieson CoreFirst Acct x1454 |
| 4/18/17 | MLT Investments, LLC | $175,000 | 23826 | Zieson CoreFirst Acct x1454 |
| | | | | |

28

| | | | | | |
|---|---|---|---|---|---|
| 6/28/17 | McPherson Contractors, Inc. | $30,866 | 10377 | Simcon CoreFirst Acct x3271 |
| 6/28/17 | METS, LLC | $30,866 | 10378 | Simcon CoreFirst Acct x3271 |
| 6/28/17 | MLT Investments, LLC | $30,866 | 10379 | Simcon CoreFirst Acct x3271 |
| | Total: | $11,090,727 | | |

99. These payments are consistent with profit distributions. They are sequential. They are round numbers that are equal or closely related in amounts. They are disbursed to entities belonging to Dingle, Torgeson and McPherson, who have been identified as originators of this scheme. Mets and MLT have no record of subcontracting work for Zieson or Simcon and no records have been discovered to show they have conducted any sort of business with Zieson and Simcon leaving no other legitimate reason for these same date, similar amount, generally sequential payments.

100. A review of Zieson bank records revealed from February 2015 through June 2017, Zieson paid TDM approximately $461,473.06. These payments appear to be for rent, likely for 1601 Iron Street in North Kansas City, Missouri. TDM is owned by Dingle as well as Torgeson and McPherson's entities.

101. From approximately April 2015 through approximately June 2017, Torgeson personally or his entity Matthew Torgeson Trustee, Dingle and CRM (owned, in part, by McPherson), received disbursements in the amount of $157,632 each from the TDM account for a total of $472,896 in disbursements as identified herein:

| Date | Payable To | Amount | Check Number | Account Drawn On |
|---|---|---|---|---|
| 4/9/15 | CRM Holdings LC | $94,300 | 1538 | TDM Holdings VisionBank Acct x3483 |
| 4/9/15 | Matthew J. Torgeson Trust | $94,300 | 1539 | TDM Holdings VisionBank Acct x3483 |
| 4/9/15 | Michael Dingle | $94,300 | 1540 | TDM Holdings VisionBank Acct x3483 |
| | | | | |
| 1/27/16 | Matthew Torgeson Trust | $16,666 | 1604 | TDM Holdings VisionBank Acct x3483 |
| 1/27/16 | Mike Dingle | $16,666 | 1605 | TDM Holdings VisionBank Acct x3483 |
| 1/27/16 | CRM Investments LC | $16,666 | 1606 | TDM Holdings VisionBank Acct x3483 |
| | | | | |
| 5/13/16 | Matthew Torgeson Trust | $16,666 | 1633 | TDM Holdings VisionBank Acct x3483 |
| 5/13/16 | Mike Dingle | $16,666 | 1634 | TDM Holdings VisionBank Acct x3483 |
| 5/13/16 | CRM Investments LC | $16,666 | 1635 | TDM Holdings VisionBank Acct x3483 |
| | | | | |
| 12/21/16 | CRM Investments LC | $10,000 | 1680 | TDM Holdings VisionBank Acct x3483 |
| 12/21/16 | Matthew Torgeson Trust | $10,000 | 1681 | TDM Holdings VisionBank Acct x3483 |
| 12/21/16 | Mike Dingle | $10,000 | 1682 | TDM Holdings VisionBank Acct x3483 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 6/20/17 | CRM Investments, L.C. | $20,000 | 1713 | TDM Holdings VisionBank Acct x3483 |
| 6/20/17 | Matthew Torgeson Trust | $20,000 | 1714 | TDM Holdings VisionBank Acct x3483 |
| 6/20/17 | Mike Dingle | $20,000 | 1715 | TDM Holdings VisionBank Acct x3483 |
| | Total: | $472,896 | | |

## ZIESON AND TORGESON ELECTRIC
## OVERLAP OF EMPLOYEE BENEFITS

102.  An employee of Torgeson Electric is the Plan Administrator for Zieson's 401(k) Retirement Plan.  The phone number provided by John Hancock, asset custodian for the Plan, corresponds with the general mailbox of Torgeson Electric.  The individual named by John Hancock as Zieson's 401(k) Retirement Plan is an employee of Torgeson Electric according to Kansas DOL records.  This is further evidence that Zieson is a pass-through for Torgeson Electric.

## ONSITE'S RELATIONSHIP TO DINGLE AND ZIESON

103.  Because of Zieson's increased size due to the many SDVOSB and 8(a) contracts Zieson had obtained, Zieson was no longer considered a small business under the NAICS codes required for set-aside Government contracts for small businesses.  Therefore, it is believed that Dingle and his co-conspirators partnered with an SDVOSB company called Onsite to use the SDV status of Baucom.

104.  Onsite was registered in Oklahoma in 2010 and Baucom is the registered agent.

105.  Baucom is an SDV.

106.  SBA-OIG received information from a competing SDVOSB

company that lost several contract awards to Onsite regarding Onsite's questionable relationship to Zieson. A review of Onsite's business records filings in Missouri revealed a direct connection to Dingle.

107. Dingle was listed as Onsite's registered agent when Onsite first registered as a foreign limited liability company in Missouri on or about May 17, 2017. The business address in that first Missouri filing was 1601 Iron Street, Suite 201, Kansas City, Missouri.

108. Approximately two weeks later, on May 30, 2017, Onsite's Missouri filing was updated, changing the registered agent from Dingle to Baucom, the SDV. The suite number changed from 201 to 209 and Baucom was also listed as President.

109. Onsite's business address listed on their website is 1601 Iron Street, Suite 209, North Kansas City, Missouri 64116, which is in the same building and floor as Zieson and Simcon.

110. According to Onsite's Operating Agreement, dated October 31, 2016 and submitted to CVE, Baucom is the sole member with 100% membership interest.

111. A review of Zieson bank account records revealed a $100,000 payment to Onsite on June 28, 2017, a $250,000 payment on August 2, 2017, a $150,000 payment on August 8, 2017, a $100,000 on September 25, 2017 and a $250,000 payment on December 12, 2017.

112. Onsite's address listed on all three checks was 1601 Iron Street, Suite 209, North Kansas City, Missouri 64116. This is the same building as Zieson's and Simcon's business address, a building owned by Torgeson, Dingle and McPherson's entity, TDM.

113. Investigation revealed that on or about August 9, 2017, the domain ONSITE-CG.COM was billed to "micahel dingle" [sic] as part of an

online purchase with GoDaddy, an internet domain provider. This transaction appeared to be paid for with a Zieson credit card. Additionally, records indicate Dingle set up all of onsite-cg.com email accounts including jacob.baucom@onsite-cg.com.

114. On August 10, 2017, Zieson Employee C, listing her position as Onsite's Director of Marketing, sent an email to GSA regarding a contract in Kansas City, Kansas, using "marketing@onsite-cg.com." Kansas quarterly records identified an individual with the same name as Zieson Employee C as a Zieson employee from the fourth quarter of 2014 to present. The Source also identified Zieson Employee C as an employee for Zieson. This information further indicates Zieson uses their employees to do Onsite work.

115. Agents obtained and reviewed Onsite's SAM database records from 2016 to January 2018. These records demonstrated that on October 17, 2016, December 9, 2016, May 18, 2017, October 11, 2017, October 12, 2017, November 1, 2017, December 21, 2017, and January 10, 2018, Baucom completed SAM certifications for Onsite. All certifications included attestations that Onsite meets SDVOSB regulations.

116. Initial investigation revealed that before becoming involved with Dingle, Onsite was not awarded any SDVOSB contracts. However, after being registered by Dingle in Missouri, Onsite obtained approximately seven Government-funded contracts totaling approximately $21.3 million, likely due to fraud, since August of 2017 from agencies such as VA and GSA. The majority, if not all, of these contracts were set-aside as SDVOSB. Based on financial investigation to date, it appears that Onsite only receives income in connection with set-aside contracts involved in the scheme.

## TRACING AND THE LOWEST INTERMEDIATE BALANCE THEORY

117.    When tracing forfeitable funds through a bank account, the Government may use any generally accepted accounting method, including "first in, first out" or "first in, last out," but the Government will always be constrained by the lowest intermediate balance principle. *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158-62 (2d Cir. 1986); *United States v. $88,029.08, More or Less, in U.S. Currency,* 2012 WL 4499084, *5 (S.D. W. Va. Sept. 28, 2012) (applying the "lowest intermediate balance" rule to grant summary judgment as to the forfeitability of drug proceeds in a commingled bank account). The lowest intermediate balance rule means that the amount of forfeitable funds on the date of the seizure may not exceed the lowest intermediate balance in the account between the date of the deposit of the allegedly forfeitable funds and the date of the seizure where the Government is relying on an actual tracing analysis (as opposed to relying on 18 U.S.C. § 984). In the tracing analysis set forth below, as to each account the Government has identified the lowest intermediate balance between the time of the deposit of the tainted funds and the date of the seizure.

## FINANCIAL ANALYSIS

118.    From April 8, 2010 to January 16, 2018, as a result of the fraud scheme, the U.S. Treasury paid approximately $317.4 million in illicit funds to Zieson, Simcon and Onsite by making direct deposits into the following accounts:

        a.      $1,174,344.16 into Torgeson Electric Community Bank account XXXX1201 (CBx1201) between April 8, 2010 and February 15, 2012;

        b.      $247,736,423.32 into Zieson CoreFirst Bank & Trust

account XXXX8993 (CFBx8993) between June 14, 2010 and January 16, 2018;

c. $481,322.49 into Zieson CoreFirst Bank & Trust account XXXX1454 (CFBx1454) between between December 9, 2014 and December 28, 2017;

d. $65,043,733.23 into Zieson Platte Valley Bank account XXXX2121 (PVBx2121) between June 23, 2015 and August 9, 2017;

e. $847,904.70 into Zieson Platte Valley Bank account XXXX2022 (PVBx2022) between February 28, 2017 and August 2, 2017;

f. $601,601.70 into Simcon CoreFirst Bank & Trust account XXXX3271 (CFBx3271) between June 20, 2017 and December 19, 2017;

g. $1,546,136.79 into Simcon Platte Valley Bank account XXXX2704 (PVBx2704) between February 1, 2017 and June 27, 2017; and

h. $179,528 and $142,597 into Onsite RCB Bank account on or about February 1, 2018.

119. Mets Platte Valley Bank account XXXX7325 (PVBx7325) received 99 transfers totaling $6,064,796.63 between July 30, 2010 and July 26, 2017 from the initial fraud scheme depository accounts. Mets PVBx7325 also received three transfers totaling $130,966.00 from TDM Vision Bank account XXXX3483 (VBx3483) between April 10, 2015 and June 22, 2017.

35

| (D) Zieson PVB Account xxx1454 | (C) Zieson PVB Account xxx2022 | (F) Simcon CFB Account xxx3271 | (G) TDM Vision Account xxxx3483 |
|---|---|---|---|
| 90 transfers to Acct. xxx7325 totaling **$3,817,621.63** 07/30/10-07/26/17 | 3 transfers to Acct. xxx7325 totaling **$2,020,343.00** 02/19/16-03/21/17 | 3 transfers to Acct. xxx7325 totaling **$95,866.00** 02/06/15-06/30/17 | 3 transfers to Acct. xxx7325 totaling **$130,966.00** 04/10/15-06/22/17 |

**(H) Mets PVB Account xxx7325**
99 transfers totaling
**$6,064,796.63**
07/30/10-07/26/17

### 6513 Ridge Road, Parkville, Missouri 64152

120.     On or about April 2, 2015, Dingle purchased a residence located at 6513 Ridge Road, Parkville, Missouri 64152 for a purchase price of $1,160,000.00.  He made a down payment, traceable to fraud proceeds, of $245,993.65 drawn on Dingle's joint account with XXXXX XXXX, Platte Valley Bank XXXX2259 (PVBx2259) and financed the purchase with a $928,000.00 loan from Platte Valley Bank (PVB).

121.     The loan was transferred from PVB to BB&T Mortgage to whom Dingle made 22 payments totaling $282,977.40 from Dingle PVBx2259.  All 23 payments totaling $528,971.05 are directly traceable to illicit proceeds from the fraud scheme

122.     Dingle used $740,544.90, including the down payment, in fraud proceeds paid from Dingle PVBx2259 and Dingle's joint account with XXXXX XXXX, Platte Valley Bank, account XXXX1928 (PVBx1928) to fund the purchase as described below.

36

123.    Transfers from Mets PVBx7325 to Dingle PVBx2259, among other accounts, are reflected in the flow chart below.



## Payments from Dingle PVBx1928

124.    Between February 11, 2015 and June 21, 2017, PVBx1928 received eight transfers of funds from Mets PVBx7325, one transfer from TDM VBx3483 and two transfers from Dingle PVBx2259 totaling $360,000, all traceable to illicit funds from the fraud scheme.

125.    Dingle made 16 payments totaling $229,771.71 between January 2017 and July 2017 from Dingle PVBx1928 to BB&T Mortgage for the loan secured by 6513 Ridge Road, Parkville, Missouri.  $211,573.85 of those 16 payments is traceable to illicit proceeds from the fraud scheme.

126.    Traced payments on Dingle's purchase of the residence located at 6513 Ridge Road, Parkville, Missouri 64152 are reflected in the table below:

Case 5:18-cv-06028-ODS   Document 17   Filed 03/16/18   Page 37 of 52

| Order | Date | Check # | Description | Amount | Traced Amt. | Drawn on |
|---|---|---|---|---|---|---|
| 1 | 04/02/15 | | Mdtg Loan closing-per email request | $ 245,993.65 | $ 245,993.65 | XXXX2259 |
| 2 | 05/12/15 | 1238 | BB&T Mortgage | $ 10,000.00 | $ 10,000.00 | XXXX2259 |
| 3 | 05/15/15 | 1241 | BB&T Mortgage | $ 10,000.00 | $ 10,000.00 | XXXX2259 |
| 4 | 05/19/15 | 1242 | BB&T Mortgage | $ 10,000.00 | $ 10,000.00 | XXXX2259 |
| 5 | 06/05/15 | 1245 | BB&T Mortgage | $ 10,000.00 | $ 10,000.00 | XXXX2259 |
| 6 | 08/11/15 | 1260 | BB&T Mortgage Payment Center | $ 10,000.00 | $ 10,000.00 | XXXX2259 |
| 7 | 08/18/15 | 1262 | BB&T Mortgage | $ 7,000.00 | $ 7,000.00 | XXXX2259 |
| 8 | 08/18/15 | 1263 | BB&T Mortgage | $ 7,000.00 | $ 7,000.00 | XXXX2259 |
| 9 | 10/07/15 | 1276 | BB&T Mortgage | $ 7,000.00 | $ 7,000.00 | XXXX2259 |
| 10 | 01/21/16 | 1303 | BB&T Mortgage Payment Center | $ 13,300.00 | $ 13,300.00 | XXXX2259 |
| 11 | 01/21/16 | 1304 | BB&T Mortgage Payment Center | $ 13,300.00 | $ 13,300.00 | XXXX2259 |
| 12 | 02/24/16 | 1320 | BB&T Mortgage Payment Center | $ 17,000.00 | $ 17,000.00 | XXXX2259 |
| 13 | 02/24/16 | 1321 | BB&T Mortgage Payment Center | $ 17,000.00 | $ 17,000.00 | XXXX2259 |
| 14 | 03/24/16 | 1335 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX2259 |
| 15 | 03/24/16 | 1337 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX2259 |
| 16 | 03/24/16 | 1338 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX2259 |
| 17 | 03/24/16 | 1339 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX2259 |
| 18 | 03/28/16 | 1336 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX2259 |
| 19 | 04/05/16 | 1341 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX2259 |
| 20 | 04/05/16 | 1343 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX2259 |
| 21 | 06/27/16 | 1366 | BB&T Mortgage Payment Center | $ 13,386.35 | $ 13,386.35 | XXXX2259 |
| 22 | 08/10/16 | 1382 | BB&T Mortgage Payment Center | $ 13,386.35 | $ 13,386.35 | XXXX2259 |
| 23 | 10/19/16 | 1401 | BB&T Mortgage Payment Center | $ 10,000.00 | $ 10,000.00 | XXXX2259 |
| 24 | 01/26/17 | 1013 | BB&T Mortgage Payment Center | $ 8,000.00 | $ 8,000.00 | XXXX1928 |
| 25 | 01/26/17 | 1014 | BB&T Mortgage Payment Center | $ 8,000.00 | $ 8,000.00 | XXXX1928 |
| 26 | 02/28/17 | 1018 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX1928 |
| 27 | 02/28/17 | 1019 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX1928 |
| 28 | 02/28/17 | 1020 | BB&T Mortgage Payment Center | $ 16,372.10 | $ 16,372.10 | XXXX1928 |
| 29 | 02/28/17 | 1021 | BB&T Mortgage Payment Center | $ 10,372.10 | $ 10,372.10 | XXXX1928 |
| 30 | 02/28/17 | 1022 | BB&T Mortgage Payment Center | $ 10,372.10 | $ 10,372.10 | XXXX1928 |
| 31 | 03/20/17 | 1024 | BB&T Mortgage Payment Center | $ 16,386.35 | $ 16,386.35 | XXXX1928 |
| 32 | 03/20/17 | 1025 | BB&T Mortgage Payment Center | $ 16,386.35 | $ 16,386.35 | XXXX1928 |
| 33 | 04/25/17 | 1030 | BB&T Mortgage | $ 16,386.35 | $ 16,386.35 | XXXX1928 |
| 34 | 04/25/17 | 1031 | BB&T Mortgage | $ 16,386.35 | $ 16,386.35 | XXXX1928 |
| 35 | 05/08/17 | 1033 | BB&T Mortgage Payment Center | $ 16,386.35 | $ 16,386.35 | XXXX1928 |
| 36 | 05/08/17 | 1034 | BB&T Mortgage Payment Center | $ 16,386.35 | $ 16,386.35 | XXXX1928 |
| 37 | 05/08/17 | 1035 | BB&T Mortgage | $ 5,592.51 | $ 5,592.51 | XXXX1928 |
| 38 | 05/15/17 | 1036 | BB&T Mortgage | $ 20,000.00 | $ 20,000.00 | XXXX1928 |
| 39 | 07/24/17 | 1041 | BB&T Mortgage | $ 20,000.00 | $ 1,802.74 | XXXX1928 |
| | | | Totals | $ 758,742.16 | $ 740,544.90 | |

## 209 2ND COURT, PALM BEACH GARDENS, FLORIDA 33410

127.    On or about August 25, 2016, Dingle purchased a residence located at 209 2nd Court, Palm Beach Gardens, Florida 33410 (Florida Property) for a purchase price of $160,000.00.  It appears Dingle now owns the Florida Property free and clear of encumbrances.

128.    As described in paragraph 124 above, between February 2015 and June 2017, PVBx1928 received transfers of illicit proceeds from Mets PVBx7325, TDM VBx3483 and Dingle PVBx2259 totaling $360,000.

129.    Dingle made all payments on the Florida Property from Dingle PVBx1928 between July 2016 and August 2017.  Of the 23 payments from Dingle PVBx1928 totaling $147,373.21, $146,663.99 is traceable to illicit proceeds from the fraud scheme as reflected in the table below.

| Order | Date | Check # | Description | Amount | Traced Amt. | Drawn on |
|---|---|---|---|---|---|---|
| 1 | 07/05/16 | 1001 | R&R Realty Inc | $ 10,000.00 | $ 10,000.00 | XXXX1928 |
| 2 | 08/31/16 | | WIRE OUT SUMMIT TITLE SERVICES CORP 14979 | $ 37,663.99 | $ 37,663.99 | XXXX1928 |
| 3 | 10/18/16 | 1007 | American Southwest Mort | $ 2,000.00 | $ 2,000.00 | XXXX1928 |
| 4 | 10/18/16 | 1008 | American Southwest Mortgage Fund | $ 2,000.00 | $ 2,000.00 | XXXX1928 |
| 5 | 10/18/16 | 1009 | American Southwest Mortgage | $ 2,000.00 | $ 2,000.00 | XXXX1928 |
| 6 | 01/03/17 | 1010 | Check #1010-WF HOME MORTGAGE CHECKPAYMT 1010 | $ 2,000.00 | $ 2,000.00 | XXXX1928 |
| 7 | 01/13/17 | 1011 | Check #1011-WF HOME MORTGAGE CHECKPAYMT 1011 | $ 2,000.00 | $ 2,000.00 | XXXX1928 |
| 8 | 01/24/17 | 1012 | Check #1012-WF HOME MORTGAGE CHECKPAYMT 1012 | $ 2,000.00 | $ 2,000.00 | XXXX1928 |
| 9 | 02/07/17 | 1015 | Check #1015-WF HOME MORTGAGE CHECKPAYMT 1015 | $ 2,000.00 | $ 2,000.00 | XXXX1928 |
| 10 | 02/17/17 | 1016 | Check #1016-WF HOME MORTGAGE CHECKPAYMT 1016 | $ 3,000.00 | $ 3,000.00 | XXXX1928 |
| 11 | 02/28/17 | 1017 | Check #1017-WF HOME MORTGAGE CHECKPAYMT 1017 | $ 5,000.00 | $ 5,000.00 | XXXX1928 |
| 12 | 03/10/17 | 1023 | Check #1023-WF HOME MORTGAGE CHECKPAYMT 1023 | $ 3,000.00 | $ 3,000.00 | XXXX1928 |
| 13 | 03/23/17 | 1026 | Check #1026-WF HOME MORTGAGE CHECKPAYMT 1026 | $ 3,000.00 | $ 3,000.00 | XXXX1928 |
| 14 | 03/31/17 | 1027 | Check #1027-WF HOME MORTGAGE CHECKPAYMT 1027 | $ 3,000.00 | $ 3,000.00 | XXXX1928 |
| 15 | 04/14/17 | 1028 | Check #1028-WF HOME MORTGAGE CHECKPAYMT 1028 | $ 3,000.00 | $ 3,000.00 | XXXX1928 |
| 16 | 04/24/17 | 1029 | Check #1029-WF HOME MORTGAGE CHECKPAYMT 1029 | $ 10,000.00 | $ 10,000.00 | XXXX1928 |
| 17 | 05/02/17 | 1032 | Check #1032-WF HOME MORTGAGE CHECKPAYMT 1032 | $ 5,000.00 | $ 5,000.00 | XXXX1928 |
| 18 | 05/15/17 | 1037 | Check #1037-WF HOME MORTGAGE CHECKPAYMT 1037 | $ 10,000.00 | $ 10,000.00 | XXXX1928 |
| 19 | 05/23/17 | 1038 | Check #1038-WF HOME MORTGAGE CHECKPAYMT 1038 | $ 10,000.00 | $ 10,000.00 | XXXX1928 |
| 20 | 06/23/17 | 1039 | Check #1039-WF HOME MORTGAGE CHECKPAYMT 1039 | $ 10,000.00 | $ 10,000.00 | XXXX1928 |
| 21 | 07/05/17 | 1040 | Check #1040-WF HOME MORTGAGE CHECKPAYMT 1040 | $ 10,000.00 | $ 10,000.00 | XXXX1928 |
| 22 | 07/21/17 | 1042 | Check #1042-WF HOME MORTGAGE CHECKPAYMT 1042 | $ 10,000.00 | $ 10,000.00 | XXXX1928 |
| 23 | 08/07/17 | 1043 | WFHM MORTGAGE CHECKPAYMT 1043 | $ 709.22 | $    - | XXXX1928 |
| | | | Totals | $ 147,373.21 | $146,663.99 | |

**6525 E. CAVE CREEK ROAD #15, CAVE CREEK, ARIZONA 85331**

130.    On or about April 14, 2015, Haavig retained approximately $300,000 in proceeds from the sale of real property located at XXXXX, Trimble, Missouri (Trimble Property).  Haavig owned the Trimble Property with Dingle prior to the sale.  As reflected in paragraph 123 and the accompanying flowchart, Dingle transferred $1,262,664 from Mets PVBx7325 to Dingle PVBx2259 between February 22, 2011 to June 21, 2017.  Most of the payments for the Trimble Property came from Dingle PVBx2259 and were directly traceable to fraud proceeds. Approximately $157,661.34 of illicit proceeds from the fraud scheme was traced into the purchase of the Trimble Property.

131.    Haavig deposited the Trimble Property sale proceeds into her Platte Valley Bank account XXXX0758 (PVBx0758) on April 14, 2015.

132.    Between September 2016 and August 2017, six transfers or deposits totaling $113,511.00 were made into Haavig's Wells Fargo account number XXXX3823 (WFx3823) from Zieson CFBx1454, Mets PVBx7325, and Monica L. Haavig Platte Valley Bank account XXXX0344 (PVBx0344). All of these transfers or deposits are traceable to illicit proceeds from the fraud scheme.

133.    Between June 11, 2013 and March 1, 2017 4 transfers totaling $168,500.00 were made into PVBx0344 from Haavig and Associates Platte Valley Bank account XXXX2127 (PVBx2127) and 2 transfers totaling $10,200.84 were made into PVBx0344 from PVBx0758.

134.    On July 14, 2015, Haavig made a $15,000 payment on lot 15 for the construction of residential property at 6525 E Cave Creek Rd. #15, Cave Creek, Arizona (Arizona Property) from PVBx0758. On August 11, 2015

Haavig made a 10% down payment of $36,569.86 to begin construction on the Arizona Property from PVBx0758.

135. On or about September 2, 2016, Haavig closed on the purchase of the Arizona Property with a $280,000 cashier's check drawn on Haavig PVBx0758. $111,793.32 is traceable to illicit proceeds from Haavig's share of the Trimble Property proceeds for purchase of the Arizona property.

136. From July 14, 2015 to December 1, 2017, Haavig made payments, including the $280,000 payment on August 30, 2016, toward the purchase of the Arizona Property, totaling $435,551.57. These payments were made from PVBx0758, Haavig and Associates Platte Valley Bank account XXXX2127 (PVBx2127), Haavig First Bank account XXXX2630 (FBx2630) and Haavig Wells Fargo account XXXX8323 (WFx3823). Of the $435,551.57, $259,173.64 is traceable to illicit proceeds from the fraud scheme as reflected in the table below.

| Order | Date | Check # | Description | Additional Description | Amount | Traced Amt. | Drawn on |
|---|---|---|---|---|---|---|---|
| 1 | 07/14/15 | 1739 | AB Hospitality | lot 15 | $ 15,000.00 | $ 15,000.00 | XXXX0758 |
| 2 | 08/11/15 | 1744 | AB Hospitality | (10% down-5,000) | $ 36,569.86 | $ 36,569.86 | XXXX0758 |
| 3 | 11/05/15 | 1215 | AB Hospitality | I-wire | $ 3,000.00 | $ 3,000.00 | XXXX2127 |
| 4 | 05/03/16 | 1227 | AB Hospitality | I-wire 0 bal | $ 4,734.00 | $ 4,734.00 | XXXX2127 |
| 6 | 08/30/16 | | Cashier's ck for closing on AZ property - Manus Title Agency | | $280,000.00 | $111,796.32 | XXXX0758 |
| 7 | 10/13/16 | 108 | Wells Fargo Home Mortgage | 052792 8667 | $ 5,000.00 | $ 5,000.00 | XXXX3823 |
| 8 | 11/07/16 | 755 | Electronic check 755 WF HOME MORTGAGE (CHECKPAYMT) | | $ 5,000.00 | $ 5,000.00 | XXXX2630 |
| 9 | 11/25/16 | 119 | Wells Fargo Home Mortgage | 0527928667 | $ 2,000.00 | $ 2,000.00 | XXXX3823 |
| 10 | 12/19/16 | 757 | Electronic check 757 WF HOME MORTGAGE (CHECKPAYMT) | | $ 4,070.00 | $ 4,070.00 | XXXX2630 |
| 11 | 01/06/17 | 129 | Wells Fargo Home Mortgage | 0527928667 | $ 5,000.00 | $ 5,000.00 | XXXX3823 |
| 12 | 02/07/17 | 137 | Wells Fargo Home Mortgage | 0527928667 | $ 3,000.00 | $ 3,000.00 | XXXX3823 |
| 13 | 03/16/17 | 146 | Wells Fargo Home Mortgage | 0527928667 | $ 40,000.00 | $ 40,000.00 | XXXX3823 |
| 14 | 04/17/17 | 149 | Wells Fargo Home Mortgage | 0527928667 | $ 10,000.00 | $ 10,000.00 | XXXX3823 |
| 15 | 05/04/17 | 159 | Wells Fargo Home Mortgage | 0527928667 | $ 1,384.73 | $ 1,384.73 | XXXX3823 |
| 16 | 06/16/17 | 162 | Wells Fargo Home Mortgage | 0527928667 | $ 2,000.00 | $ 2,000.00 | XXXX3823 |
| 17 | 07/06/17 | 170 | Wells Fargo Home Mortgage | 0527928667 | $ 3,000.00 | $ 2,149.77 | XXXX3823 |
| 18 | 07/18/17 | 173 | Wells Fargo Home Mortgage | 0527928667 | $ 3,000.00 | $        - | XXXX3823 |
| 19 | 08/18/17 | 179 | Wells Fargo Home Mortgage | 0527928667 | $ 3,000.00 | $ 3,000.00 | XXXX3823 |
| 20 | 09/11/17 | 183 | Wells Fargo Home Mortgage | 0527928667 | $ 2,000.00 | $    468.96 | XXXX3823 |

41

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 21 | 10/16/17 | 781 | Electronic Check WF HOME MORTGAGE (CHECKPYMT) | | $ 5,000.00 | $ 5,000.00 | XXXX2630 |
| 22 | 11/07/17 | 193 | Wells Fargo Home Mortgage | 0527928667 | $ 1,396.49 | $ - | XXXX3823 |
| 23 | 12/01/17 | 196 | Wells Fargo Home Mortgage | 0527928667 | $ 1,396.49 | $ - | XXXX3823 |
| | | | | Totals | $435,551.57 | $259,173.64 | |

## NATIONAL FINANCIAL SERVICES SEP IRA
## ACCOUNT NUMBER XXXX 2585 FBO MICHAEL P DINGLE

137.    Dingle has an Individual Retirement Account (IRA) at National Financial Services serviced by MML Investors Services, IRA Account Number XXXX2585 (IRAx2585) held for the benefit of Michael P. Dingle.

138.    Dingle's IRA x2585 was wholly funded by a transfer from Dingle's Wells Fargo Advisors account XXXX6516 (WFx6516) on May 23, 2017.

139.    Dingle funded WFx6516 with five deposits totaling $231,498.00 from Dingle PVBx2259 from March 2013 to April 2017 as identified in the table below.  As described in paragraphs 118 and 119 above, PVBx2259 received approximately $6 million in illicit proceeds from the accounts into which the U.S. Treasury initially deposited fraud scheme proceeds between July 2010 and July 2017.

42

140.    The chart below reflects illicit proceeds disbursed from Mets PVBx7325 to accounts including Dingle PVBx2259.



141.    All $231,498.00 deposited into WFx6516 and subsequently transferred into IRAx2585 is traceable to illicit proceeds from the fraud scheme.  IRAx2585 now includes, in addition to funds traceable to the fraud scheme, interest and additional deposits which are also subject to seizure, restraint and forfeiture, based on Dingle's money laundering.  As of November 30, 2017, the account balance was $366,812.03.

| Order | Date | Check # | Description | Amount | Traced Amt. | Drawn on |
|---|---|---|---|---|---|---|
| 1 | 03/27/13 | 1170 | Wells Fargo Advisors | $  22,498.00 | $  22,498.00 | XXXX2259 |
| 2 | 02/25/14 | 1198 | Wells Fargo Advisors | $  51,000.00 | $  51,000.00 | XXXX2259 |
| 3 | 03/11/15 | 1229 | Wells Fargo Advisors | $  52,000.00 | $  52,000.00 | XXXX2259 |
| 4 | 04/18/16 | 1349 | Wells Fargo Advisors | $  53,000.00 | $  53,000.00 | XXXX2259 |
| 5 | 04/11/17 | 1470 | Wells Fargo | $  53,000.00 | $  53,000.00 | XXXX2259 |
| | | | Totals | $ 231,498.00 | $ 231,498.00 | |

## NATIONAL FINANCIAL SERVICES
## P MICHAEL DINGLE REVOCABLE TRUST
## P MICHAEL DINGLE TRUSTEE
## ACCOUNT NUMBER XXXX2665

142.     Dingle has a revocable trust at National Financial Services, account number XXXX2665 (Trustx2665) serviced by MML Investors Services for P. Michael Dingle Revocable Trust, P Michael Dingle, Trustee. Trustx2665 was funded by a $250,000 check remitted to National Financial Services from Mets PVBx7325 on or about June 1, 2017. As described in paragraphs 118 and 119 above, PVBx2259 received approximately $6 million in illicit proceeds from the accounts into which the U.S. Treasury initially deposited fraud scheme proceeds between July 2010 and July 2017.

143.     All $250,000 deposited into Trustx2665 is traceable to illicit proceeds from the fraud scheme. Further, any interest and additional deposits are also subject to seizure, restraint and forfeiture based on Dingle's money laundering. As of October 1, 2017, the account balance was $259,538.12.

## MONICA L. HAAVIG (IRA) WELLS FARGO ADVISORS ACCOUNT
## NUMBER XXXX1125

144.     Haavig has an IRA held at Wells Fargo Advisors, account XXXX 1125 (WFx1125). Haavig funded WFx1125 with deposits from Haavig and Associates PVBx2127.

145.     Between March 2013 and May 2017, Haavig and Associates PVBx2127 received deposits of approximately $601,000 from Mets PVBx7325 and Zieson CFBx1454.

146.     On September 30, 2013, Haavig made a payment of $6,000 into WFx1125 from Haavig and Associates PVBx2127. On April 10, 2015, Haavig

made a second payment of $5,218 into WFx1125 from Haavig and Associates PVBx2127. Both deposits into WFx1125 are traceable to illicit proceeds from the fraud scheme derived from Mets and Zieson accounts. Further, any interest accrued thereon is also subject to seizure, restraint and forfeiture. As of October 31, 2017, the account balance of WFx1125 is $236,293.49.

## MONICA L HAAVIG SEP IRA WELLS FARGO ADVISORS ACCOUNT NUMBER XXXX 4187

147. Haavig has an IRA account held at Wells Fargo, account XXXX 4187 (WFx4187). Haavig made three payments into the account between April 2014 and April 2017 totaling $69,079. The three payments totaling $69,079 are traceable to illicit proceeds from the fraud scheme.

148. As described in paragraph 145 above, between March 2013 and May 2017, Haavig and Associates PVBx2127 received deposits of approximately $601,000 from Mets PVBx7325 and Zieson CFBx1454, both of which were funded by fraud proceeds.

149. Between December 21, 2016 and December 20, 2017 Monica L. Haavig Wells Fargo account XXXX3823 (WFx3823) received deposits of approximately $12,812.04 from Mets PVBx7325 and Zieson CFBx1454.

150. Haavig transferred $88,699 from PVBx2127 to Haavig WFx3823 between March 6, 2017 and August 15, 2017.

151. On April 29, 2014 Haavig made a $5,475 payment into WFx4187 drawn on Haavig and Associates PVBx2127 and traceable to the fraud scheme.

152. On April 18, 2016, Haavig made a $26,686 payment into WFx4187 drawn on Haavig and Associates PVBx2127 and traceable to the fraud scheme.

153.    On April 17, 2017, Haavig made a $36,918 payment into WFx4187 drawn on Haavig's WFx3823 and traceable to the fraud scheme. Any interest accrued on the $69,079 deposits traceable to fraud is also subject to seizure, restraint and forfeiture.  As of October 31, 2017, the account balance of WFx4187 is $194,925.38.

## TORGESON ACCOUNTS AT PERSHING

154.    As shown in the illustration below, approximately $25 million from Zieson and $1.7 million from Simcon were deposited into Torgeson Electric's Community Bank account XX6372 (CBx6372).



155.    Between September 17, 2010 and June 27, 2017, as a result of the fraud scheme, Matthew L. Torgeson US Bank account XXXX7760 (USBx7760) received 176 deposits from Torgeson Electric CBx6372; Zieson

CFBx1454; TDM VBx3483; MLT U.S. Bank Account XXXX8983 (USBx8983); Torgeson Trenching Inc. Community Bank Account XXXX6364 (CBx6364) and First Avenue Leasing, LLC Landmark National Bank account XXXX9754 (LNB x9754) totaling approximately $13,593,495.22. Illicit proceeds in USBx7760 were used to fund investment accounts held by Pershing LLC as described herein and depicted on the flow chart below:



**PERSHING LLC ACCOUNT NUMBER XXXX8721 IN THE NAME OF MATTHEW L. TORGESON TRUST, UAD 03/15/10, MATTHEW L TORGESON TTEE, XXXXXXX, TOPEKA KS 66606-1937**

156.   In or about August 2016, Pershing LLC account XXXX8721 (Trustx8721) was opened for Matthew L. Torgeson Trust with Torgeson as trustee.

157.   From September 8, 2016 to August 7, 2017, Torgeson made three deposits totaling $2,400,000.00 drawn on Matthew Torgeson Trustee

USBx7760 into Trustx8721.

158.    All $2,400,000.00 is traceable to illicit proceeds obtained as a result of the fraud scheme.  Further, any interest and additional deposits are also subject to seizure, restraint and forfeiture based on Torgeson's money laundering.

### PERSHING LLC ACCOUNT NUMBER XXXX2203 IN THE NAME OF MATTHEW L. TORGESON TRUST, XXXXXX, TOPEKA KS 66606-1937

159.    In or about August 2010, Pershing LLC account XXXX2203 (Trustx2203) was opened as Matthew L. Torgeson Trust with Torgeson as trustee.

160.    Between December 2, 2010 and June 23, 2016, 10 deposits were made to Trustx2203 totaling $3,643,000 from Torgeson USBx7760.

161.    Of the $3,643,000 deposited into Trustx2203, $3,539,197.18 is traceable to illicit proceeds derived from the fraud scheme. Further, any interest and additional deposits are also subject to seizure, restraint and forfeiture based on Torgeson's money laundering.

| Order | Date | Check # | Description | Amount | Traced Amt. | Drawn on |
|---|---|---|---|---|---|---|
| 1 | 12/02/10 | 2573 | Pershing LLC | $  181,000.00 | $  181,000.00 | xxx7760 |
| 2 | 01/06/11 | 2589 | Pershing LLC | $  262,000.00 | $  262,000.00 | xxx7760 |
| 3 | 04/14/11 | 2611 | Pershing LLC | $  125,000.00 | $  125,000.00 | xxx7760 |
| 4 | 04/26/11 | 2614 | Pershing LLC | $  150,000.00 | $  150,000.00 | xxx7760 |
| 5 | 06/21/11 | 2695 | Pershing LLC | $  100,000.00 | $   43,832.81 | xxx7760 |
| 6 | 07/29/11 | 2699 | Pershing LLC | $   50,000.00 | $    2,400.00 | xxx7760 |
| 7 | 04/28/15 | 2884 | Pershing LLC | $  500,000.00 | $  499,964.37 | xxx7760 |
| 8 | 01/05/16 | 3013 | Pershing LLC | $ 1,430,000.00 | $ 1,430,000.00 | xxx7760 |
| 9 | 03/09/16 | 3020 | Pershing LLC | $  645,000.00 | $  645,000.00 | xxx7760 |
| 10 | 06/23/16 | 2899 | Pershing LLC | $  200,000.00 | $  200,000.00 | xxx7760 |
| | | | Totals | $ 3,643,000.00 | $ 3,539,197.18 | |

48

**PLATTE VALLEY BANK ACCOUNT # XXXX2022 (PVBX2022)**
**ZIESON CONSTRUCTION COMPANY, LLC**
**ALL FUNDS IN THE ACCOUNT**

162.     On June 15, 2015, Platte Valley Bank commercial analysis account XXXX2022 (PVBx2022) was opened in the name of Zieson Construction Company, LLC, with an address of 1601 Iron Street, Suite 201, North Kansas City, MO 64116.  This account listed Stephon Ziegler as the signor.

163.     Between February 28, 2017 and August 2, 2017, as a result of the fraud scheme described above, the Government awarded contracts and made approximately four payments totaling approximately $847,904.70 directly into PVBx2022.

164.     Additionally, from June 15, 2015 to August 10, 2017, PVBx2022 received approximately 395 transfers from Zieson PVBx2121 and Zieson CFBx1454 totaling approximately $120,390,137.92.  All of these deposits are suspected as traceable to illicit proceeds from the U.S. Treasury for alleged fraud of the SDVOSB and 8(a) programs.

165.     Based on financial analysis of traceable fraud proceeds, the United States sought seizure of up to $1,000,000 as the lowest intermediate balance of funds traceable to fraud.  Any funds remaining after seizure of up to $1,000,000 is subject to forfeiture and restraint because there is probable cause to believe that any additional money in the account is either a deposit from the sweep account identified below, is direct deposit of money from the Government due to fraud or a transfer of illicit proceeds from CFBx1454.

166.     As of February 21, 2018, approximately $2,210,178.69 was in PVBx2022.

**PLATTE VALLEY BANK ACCOUNT # XXXX2207**
**(PVB X2207)**
**ZIESON CONSTRUCTION COMPANY, LLC**
**ALL FUNDS IN THE ACCOUNT**

167.    On June 16, 2015, Platte Valley Bank commercial repurchase agreement account XXXX2207 (PVBx2207) was opened in the name of Zieson Construction Company, LLC.  The address on the account is 1601 Iron St. Ste. 201, North Kansas City, MO 64116.

168.    PVBx2207 is Zieson's sweep account.  Funds are automatically transferred into this higher interest-earning account upon close of business to earn interest.  Those funds are returned, after the overnight accrual of interest, to the account from which they originated.

169.    Between June 22, 2015 to August 11, 2017, as a result of the fraud scheme, PVBx2207 received approximately 1,784 transfers from Zieson PVBx2022 totaling approximately $3,000,000.

170.    The Government was induced to make payments to Zieson and Simcon based on fraud.  Thereafter, the illicit proceeds were transferred from the initial deposit account into business operating accounts, including Zieson PVBx2022 and Zieson CFBx1454.  Illicit proceeds were transferred from PVBx2022 to the target sweep account.  The only deposits into this sweep account are from PVBx2022, suspected as illicit proceeds traceable to the alleged fraud of the SDVOSB and 8(a) programs, and interest accrued thereon.

### CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF

171.    The Plaintiff repeats and incorporates by reference the paragraphs above.

172.     By the foregoing and other acts, the defendant properties constitute or are derived from proceeds traceable to a violation of Title 18, United States Code, Section 1343, and therefore, are forfeitable to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

173.     The Plaintiff repeats and incorporates by reference the paragraphs above.

174.     By the foregoing and other acts, the defendant properties were involved in transactions or attempted transactions in violation of Title 18, United States Code, Sections 1956, 1957, and 1960, or are properties traceable to such a transaction, and therefore, are forfeitable to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

WHEREFORE the United States prays that the defendant properties be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

Timothy A. Garrison
United States Attorney

By:     _/s/ Stacey Perkins Rock_
Stacey Perkins Rock, #66141
Assistant United States Attorney
400 E. 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122
E-mail: stacey.perkins-rock@usdoj.gov

51

## VERIFICATION

I, Special Agent Jason Brushwood hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Internal Revenue Service – Criminal Investigation, that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, or have been reported to me by other law enforcement agents and analysts, and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Internal Revenue Service – Criminal Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated:   March 5, 2018          */s/ Jason Brushwood*
                               Special Agent Jason Brushwood
                               Internal Revenue Service
                               Criminal Investigation

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## <u>CIVIL COVER SHEET</u>

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

| **Plaintiff(s):** | **Defendant(s):** |
|---|---|
| <span style="color:red">First Listed Plaintiff:</span> | <span style="color:red">First Listed Defendant:</span> |
| United States of America ; | REAL PROPERTY LOCATED AT 6513 RIDGE ROAD, PARKVILLE, |
| **County of Residence:** Jackson County | MISSOURI, 64152, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS; ; |
| | **County of Residence:** Platte County |

<span style="color:red">Additional Defendants(s):</span>
REAL PROPERTY LOCATED AT 209 2ND COURT, PALM BEACH GARDENS, FLORIDA, 33410, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS;

REAL PROPERTY LOCATED AT 6525 EAST CAVE CREEK ROAD, NUMBER 15, CAVE CREEK, ARIZONA 85331, ALONG WITH ALL ITS BUILDINGS, APPURTENANCES, AND IMPROVEMENTS;

NATIONAL FINANCIAL SERVICES IRA ACCOUNT NUMBER xxxxx2585, SERVICED BY MML INVESTOR SERVICES;

NATIONAL FINANCIAL SERVICES IRA ACCOUNT NUMBER xxxxx2665, SERVICED BY MML INVESTOR SERVICES;

$11,218.00 PLUS ACCRUED INTEREST IN WELLS FARGO ADVISORS ACCOUNT NUMBER xxxx1125;

$69,079.00 PLUS ACCRUED INTEREST IN WELLS FARGO ADVISORS ACCOUNT NUMBER xxxx4187;

PERSHING LLC ACCOUNT NUMBER xxxx8721;

PERSHING LLC ACCOUNT NUMBER xxxx2203,

ALL FUNDS IN PLATTE VALLEY BANK ACCT. NO. xxx2022 IN THE NAME OF ZIESON CONSTRUCTION COMPANY, LLC;

ALL FUNDS IN PLATTE VALLEY BANK ACCT. NO. xxxxx2207 IN THE NAME OF ZIESON CONSTRUCTION CO LLC. ;

**County Where Claim For Relief Arose:** Jackson County

**Plaintiff's Attorney(s):**          **Defendant's Attorney(s):**

Assistant United States Attorney
Stacey Perkins Rock ( United
States of America)
United States Attorney's Office
400 E. 9th Street, Fifth Floor
Kansas City, Missouri 64106
**Phone:** 816-426-7173
**Fax:**
**Email:** stacey.perkins-
rock@usdoj.gov

**Basis of Jurisdiction:** 1. U.S. Government Plaintiff

**Citizenship of Principal Parties** (Diversity Cases Only)

    **Plaintiff:** N/A

    **Defendant:** N/A

**Origin:** 1. Original Proceeding

**Nature of Suit:** 690 All Other Forfeiture and Penalty Actions

**Cause of Action:** The defendant properties are subject to forfeiture pursuant to 18 U.S.C. §
981(a)(1)(A) because they constitute property involved in transactions or in attempted
transactions in violation of sections 1956, 1957 and 1960 of Title 18, United States Code, or
are properties traceable to such property. The defendant properties are subject to forfeiture
pursuant to 18 U.S.C. § 981(a)(1)(C), because they constitute or were derived from proceeds
traceable to an offense constituting a SUA as defined in Section 1956(c)(7) and 1961(1) of
Title 18, United States Code, or a conspiracy to commit such offense. Such offenses include
violations of 18 U.S.C. § 1343 (wire fraud) and 1956 (money laundering).

**Requested in Complaint**

    **Class Action:** Not filed as a Class Action

    **Monetary Demand (in Thousands):** Above-listed Defendant Property

    **Jury Demand:** No

    **Related Cases:** Is NOT a refiling of a previously dismissed action

**Signature:** Stacey Perkins Rock

**Date:** 3/2/2018

If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.

# EXHIBIT 1



Matt McPherson

McPherson Contractors
CRM Investments

Matt Torgeson

Torgeson Electric
MLT Investments

Zieson
Simcon
Onsite
TDM

Torgeson, Dingle and
McPherson are believed to
actually control Zieson, Simcon
and Onsite

Mike Dingle

METS, LLC